IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| A.C., by and through her parents, | : | CIVIL ACTION |
| TAMMY C. and JASON C., of | : | |
| Wilmington, Delaware | : | |
| | : | |
| v. | : | |
| | : | |
| BRANDYWINE SCHOOL DISTRICT | : | NO.  21-0713 (LFR) |

MEMORANDUM OPINION

L. FELIPE RESTREPO                                                                       FEBRUARY 10, 2023
UNITED STATES CIRCUIT JUDGE

A.C., by and through her parents (collectively, "Plaintiffs"), brought this civil action against the Brandywine School District ("Brandywine" or "the District"), which is located in Wilmington, Delaware.  According to Plaintiffs, Brandywine failed to provide A.C. a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1400–82.  Plaintiffs further allege discrimination in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.

This action follows the decision of a Delaware Department of Education Due Process Panel ("the Panel").[1]  Before the Court are cross-motions for judgment on the administrative record.  For the reasons that follow, Brandywine's motion is granted,

---

[1] The complete amended certified copy of the record of the Due Process Hearing was filed March 3, 2022 (ECF 19) and is cited herein as "R."

Plaintiffs' cross-motion is denied, and Judgment is entered in Brandywine's favor.

## I.  BACKGROUND

### a.  Statutory Framework

The IDEA offers States federal funds to assist in educating disabled children. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). Those federal funds – as is often the case – come with strings attached: accepting States must comply with certain statutory requirements. *Id.* at 994. One of those requirements is that every disabled child receives a "free appropriate public education," *see* 20 U.S.C. § 1412(a)(1), which includes both "special education" and "related services." § 1401(9). As defined by the Act, "special education" is "specially designed instruction . . . to meet the unique needs" of a disabled child; "related services" are any support services or accommodations "required to assist" in that instruction. § 1401(29), (26); s*ee also Endrew F.*, 137 S. Ct. at 993–94.

The States provide special education and related services by developing an "individualized education program" ("IEP") for each disabled student. § 1401(9)(D). An IEP is a written comprehensive education plan identifying a disabled child's present performance levels and future academic goals, and it outlines concrete steps to assist the student. §§ 1412(a)(4), 1414(d).

To comply with the IDEA, an IEP must be "reasonably calculated to enable . . . progress appropriate in light of the [disabled student's] circumstances." *Endrew F.*, 137 S. Ct. at 1001. That language is consistent with our Circuit's understanding: the

2

educational program "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (internal quotation marks and citation omitted); s*ee also K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

### b. Facts

*Kindergarten to the third grade, 2013 – 2017.* A.C. attended public school in the Brandywine School District from kindergarten through the fifth grade. Before the third grade, A.C.'s behavior in school and at home became a concern. At this point, A.C.'s parents were primarily concerned with their daughter's reading abilities. Brandywine apparently acknowledged this concern, since in the third grade, A.C. received Tier III Response to Intervention ("RTI") academic training.[2]

---

[2] RTI is a general, not special, education initiative. R. 520. It provides students with scientifically-based tiered interventions designed to assist in reading. *Id.* With RTI in place, students can make progress in reading comprehension without receiving special education services. *Id.* Tier I is for students who read at grade level but may have some issues. R. 438. Tier II is for those students who read at or below grade level and require targeted interventions. R. 439. Tier III – the most intensive Tier – is for students who are at high risk of failure and may qualify for special education services. *Id.* Ms. Tania Pearson, M.A., a Brandywine school psychologist, described Tier III as follows: "When a student receives a Tier III intervention, they're getting the highest level of intervention *prior to considering specialized instruction*, and it is more individualized." R. 413 (emph. added). Dr. Lisa Lawson, Assistant Superintendent at Brandywine, further explained: "[Y]ou can have students in Tier III for many years, and they still don't qualify or become eligible for special education and related services. RTI is a general education initiative, and it was done on purpose so that we could look to see if students could make progress with scientifically based evidence interventions without identifying them with a disability that they did not have." R. 520.

3

*Fourth grade, 2017 – 2018.* In the beginning of her fourth-grade year, A.C. continued to struggle with reading. To start off the year, she performed poorly on the STAR exam,[3] scoring in the third-grade equivalency range. R. 440–41. So she remained in Tier III RTI, receiving two specific intervention programs: Road to Reading and Read Naturally Fluency.[4] By the end of fourth grade, in Spring 2018, A.C. scored near fifth-grade equivalency standards on the STAR exam. R. 441.

Over the course of her fourth-grade year, A.C. underwent a series of academic and behavioral tests. First, in January and February 2018, Ms. Pearson, the Brandywine certified school psychologist, evaluated A.C.'s academic abilities using various metrics.[5] One test revealed that A.C.'s scores for reading comprehension fell into the 2.9 grade equivalency category, which meant that A.C. was reading far below fourth-grade standards. Ms. Pearson, however, testified that grade equivalency standards are not "empirically sound," and that A.C.'s reading capabilities, when compared to other fourth-grade students, fell into an average percentile. R. 403–05. A.C.'s math skills were average. R. 403. Once Ms. Pearson completed this first set of academic tests, she

---

[3] The STAR exam is a reading comprehension exam. R. 440–41. All Brandywine students take the STAR exam three times throughout the year to measure ability. *Id.*

[4] The former is a phonics-based reading class, which at the time A.C. received it was administered by a special education teacher; the latter addressed reading comprehension and fluency. R. 395.

[5] To be thorough, Ms. Pearson examined A.C. using the Wechsler Intelligence Scale for Children, the Wechsler Individual Achievement Test, and the Test of Written Language. Ms. Pearson also drew from report cards, interviews with faculty, and A.C.'s parents. R. 402.

4

mentioned that A.C. exhibited signs of anxiety and suggested that A.C. undergo socioemotional testing.  R. 404.  A.C.'s parents agreed to further testing, so Ms. Pearson then administered to A.C. the Behavior Assessment System for Children.[6]  R. 405.  The test revealed signs of anxiety, depression, and poor social skills.  *Id.*

Shortly thereafter, A.C.'s parents sought private therapy for A.C., and the therapist diagnosed A.C. with a general anxiety disorder.  As a result, Brandywine created a Section 504 academic plan for A.C., which would be implemented the following year and included generic accommodations.  For example, among other things, teachers would: make sure A.C. understood directions; allow A.C. to have extra time in completing assignments; read specific questions to A.C.; and have A.C. summarize concepts or directions.  R. 617.

*Fifth Grade, 2018 – 2019.*  A.C.'s anxiety worsened during the fifth grade.  Concerned, her parents requested an independent educational evaluation ("IEE"),[7] which Brandywine granted.  Dr. Harris Finkelstein completed this evaluation in February 2019 and concluded that A.C. suffered from generalized anxiety and attention deficit hyperactivity disorder ("ADHD").  R. 618.  *See also* Pls.' Br. 5.

---

[6] The Behavior Assessment for Children, as Ms. Pearson testified, is "highly valid and reliable."  R. 405.  It is a behavioral rating system that adults in contact with the student complete.  *Id.*  A.C.'s mother and one of her teachers, Mrs. Anderson, completed this assessment.  *Id.*  Only A.C.'s mother's assessment indicated signs of anxiety, depression, and poor social skills.  R. 406.

[7] An IEE is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question…" 34 C.F.R. § 300.502(a)(3)(i).

*End of Fifth Grade: the June and August 2019 IEP.*  Approximately three months later, in May 2019, Brandywine determined that A.C. qualified for an IEP under the IDEA.  Pls.' Br. 5.  In June 2019, Brandywine developed A.C.'s first IEP, and in August 2019, the District revised it.  The IEP had three goals.  The first two related to A.C.'s reading abilities and the third to her anxiety:

- *Goal 1 – Inferential Reading Comprehension.*  This first goal targeted reading comprehension and consisted of various supports and accommodations.[8]  R. 443.  In addition to the supports and accommodations, A.C. would receive direct instruction three times per week for fifteen minutes each session.  *Id.  See also* R. 620.

- *Goal 2 – Written Response to Text-Based Questions.*  The second goal would help A.C. better understand how to answer reading comprehension questions.[9]  R. 444.  And just as the first goal, A.C. would receive direct instruction related to text-

---

[8] The following is a partial list of the various supports and accommodations: the teacher would model how to locate clues in the text to help make inferences; A.C. would receive extra time to read and answer questions; the teacher would break assignments into manageable parts, frequently check in on A.C., and highlight information in the text; the teacher would provide "sticky note" summaries of the text to A.C. and "whisper" to her as needed; the teacher would simplify directions, and A.C. would sit close to the source of instruction in her classes.  R. 444.

[9] The following is a partial list of the supports and accommodations attached to the second goal: A.C would read the questions multiple times; the teacher would highlight information in the questions and orally read A.C.'s written answer to check for meaning; the teacher would provide extra time to A.C. and would simplify directions.  R. 444.

> based responses three times per week for fifteen minutes each session.  *Id.  See also* R. 620.
>
> - *Goal 3 – Anxiety as Related to Task Involvement and Completion.*  The third goal would, according to Brandywine, help A.C. develop anxiety-reducing strategies.  R. 445.  To implement this goal, A.C. would receive individual counseling twice per week for thirty minutes, and she would receive consultative counseling for forty minutes per month.  *Id. See also* R. 620.

To support all three goals, A.C. would attend a "learning support class in the special education setting."  R. 443.  *See also* AR 357; Pls.' Reply Br. 7.  Before the Panel, Ms. Denise Dilks, a special education teacher at Brandywine, testified that A.C. would attend this learning support class for 90 minutes every other day; once there, according to this testimony, A.C. would receive special instruction to advance her three goals.  R. 443.

*September 2019 and the Private School Placement.*  Plaintiffs did not give Brandywine the chance to implement this IEP.  Believing the IEP "inadequate," Plaintiffs withdrew A.C. from Brandywine and enrolled her in the Sanford School,[10] a private school in Hockessin, Delaware.  Pls.' Br. 7.

---

[10] The Sanford School is "an independent, college-preparatory school for boys and girls in preschool (age 3) through high school."  *See* https://www.sanfordschool.org/about.  Located on a 100-acre teaching campus, Sanford prides itself as being one of the best private schools in the region.  *See id.*  Sixth grade at Sanford costs $25,700; seventh grade is $27,600.  *See* https://www.sanfordschool.org/admission/affordability/tuition.  Dr. Lawson was surprised Plaintiffs chose Sanford.  In her words, Sanford does not "concentrate its focus on students with disabilities or students with special needs…"  R. 526-27.

### c. Procedural History

On July 30, 2021, A.C. and her parents filed a due process complaint with the Delaware Department of Education. Pls.' Br. 3. They sought compensatory damages for fourth and fifth grade (the 2017–2018 and 2018–2019 school years), reimbursement for tuition paid to the Sanford School for sixth and seventh grade (the 2019–2020 and 2020–2021 school years), and prevailing-party attorneys' fees. *Id.* Invoking the IDEA, Plaintiffs argued that Brandywine denied A.C. a FAPE.

The Panel found in part for A.C. and in part for Brandywine. Based on parent and teacher testimony, the Panel concluded that Brandywine should have known A.C. needed special education services for fourth and fifth grade. So, finding that Brandywine did not provide A.C. a FAPE for those years, the Panel awarded A.C. compensatory education worth $31,800. The Panel, however, concluded that, by finally offering A.C. the August 2019 IEP, Brandywine complied with the IDEA and did not need to reimburse A.C. for tuition paid to Sanford. And, lacking jurisdiction, the Panel refused to entertain the prevailing-party attorneys' fees issue.

## II. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1331. When reviewing an appeal from a state administrative decision under the IDEA, federal district courts conduct a modified *de novo* review. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). This means that district courts make their own findings by a preponderance of the evidence but also give "due weight" to findings in the

administrative proceeding.  *Id.  See also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  "Factual findings from the administrative proceedings are to be considered prima facie correct."  *State-Operated Sch. Dist. of Newark*, 336 F.3d at 270.  And "[i]f the reviewing court does not adhere to those findings, it is obliged to explain why."  *Id.* (citation omitted).

## III. DISCUSSION

Plaintiffs seek tuition reimbursement for A.C.'s sixth-and-seventh-grade years at the Sanford School under the IDEA, the Rehabilitation Act, and the ADA.[11]  Based on the record, Brandywine complied with all three of these Acts and the District offered A.C. a FAPE.

### a. Whether Brandywine Violated the IDEA

A student is entitled to tuition reimbursement for a unilateral placement "*only* if a federal court concludes both that the public placement violated [the] IDEA and that the private school placement was proper under the Act."  *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993).  To satisfy the first prong[12] – that the public

---

[11] The Panel's decision to award compensatory damages to Plaintiffs for A.C.'s fourth-and-fifth-grade years is not challenged in this civil action.  Therefore, it is unnecessary to address that portion of the Panel's decision.

[12] Brandywine also argues that the evidence adduced at the hearing demonstrated that Sanford was not an appropriate placement for A.C. because it did not provide the evidence-based specialized instruction A.C. required for her reading and emotional needs.  Def.'s Br. 2–3.  Because Brandywine offered A.C. an appropriate IEP, it is not necessary to reach the second prong under *Florence County* – i.e., whether the private school placement was proper under the IDEA.

9

placement violated the IDEA – Plaintiffs must prove that Brandywine failed to offer A.C. an IEP "reasonably calculated to enable…[her] to make progress appropriate in light of [her] circumstances."  *Endrew F.*, 137 S. Ct. at 1001.

As *Endrew F.* instructs, the discussion must focus on the IEP.  According to Plaintiffs, the IEP is facially deficient because it fails to provide "sufficient supports and services to meet [A.C.'s] reading, math, emotional, behavioral, and executive functioning needs."  Pls.' Br. 17.  Plaintiffs add they were unaware A.C. would receive RTI in middle school since the IEP did not include RTI.  Pls.' Br. 12.  And finally, Plaintiffs contend they were unaware A.C. would receive 90 minutes of special instruction every other day to support her goals – they complain that the IEP *only* lists a "learning support class" and did not spell out its precise contours.  Pls.' Reply Br. 7.

*Reading*.  Plaintiffs first argue that the IEP fails to provide "sufficient supports and services to meet [A.C.'s] reading…needs."  Pls.' Br. 17.  As a preliminary note, Plaintiffs provide no explanation as to *why* the IEP's reading-related supports are insufficient.  The IEP listed two goals related to reading: one to assist in "reading comprehension" and another to assist in responding to "text based…questions."  As the Panel explained – and as the record indicates – both goals included various supports and accommodations and required A.C. to receive direct instruction for 45 minutes each week.  For example, A.C.'s teachers would: model how to make logical inferences when reading texts; allow A.C. to have extra time to read and answer questions; break assignments into manageable chunks; highlight important information in texts and frequently check A.C. for

10

understanding; simplify directions and provide sticky–note summaries of reading materials to A.C.; and make sure that A.C. sat close to the source of instruction. R. 620. And to be clear, these supports and accommodations were not exhaustive.[13]

"Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999. An IEP need not provide "the optimal level of services" that parents might desire for their child. *Bayonne Bd. of Educ.*, 602 F.3d at 557. "The IEP must aim to enable the child to make progress." *Endrew F.*, 137 S. Ct. at 999. Applying these standards here, the IEP's reading-related services and accommodations were reasonably designed to enable A.C. to make progress.

*Math*. Plaintiffs next focus on the IEP's lack of any math-related services or supports. Plaintiffs argue that the IEP's failure to "provide special education instruction in math" adds to its deficiency. Pls.' Br. 11. However, the record makes clear that A.C.'s math skills were average, and her math fluency scores were above average. R. 403. Indeed, A.C.'s fifth-grade progress report showed that she progressed in mathematics.[14]

---

[13] Approximately 10 more supports and accommodations were laid out in A.C.'s reading goals. *See* R. 620-21.

[14] For example, Rebecca Hurford, A.C.'s fifth grade teacher at Brandywine, testified: "[I]n operations and algebraic thinking, [A.C.] continued to work at a fifth grade level…[N]umbers and operations, she mastered by that second marking period. She could do all that with no problem. Same with measurement and data…*So that's working at the fifth grade level*." R. 430 (emph. added).

11

Plaintiffs' math-related claim is similar to the situation in *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009). There, plaintiffs argued that a school district denied their son a FAPE since the IEP and evaluation report ("ER") lacked services related to "math computation and…social and emotional functioning." *Id.* at 738. As the Court noted, "those areas were not identified as suspected disabilities and so were properly excluded from the ER." *Id.* Similarly, the record here fails to indicate that A.C. had a math-related disability. Therefore, the IEP need not include a math-related goal.

*Emotional, Behavioral, and Executive Functioning*. Plaintiffs next argue that the IEP fails to address A.C.'s "emotional, behavioral, and executive functioning" needs. Pls.' Br. 17. Specifically, they complain that the IEP did not provide "direct instruction to help with…ADHD and executive functioning needs." Pls.' Br. 16. But this claim has little basis in the record. To accommodate for A.C.'s ADHD and general anxiety, Brandywine offered individual counseling twice per week for 30 minutes each session and consultative counseling. As to individual counseling, a school psychologist would meet with A.C. to develop anxiety-reducing strategies, and as to consultative counseling, the psychologist would observe A.C. in classrooms and work with her teachers and parents.

It is worthwhile to compare these Brandywine offerings to the Sanford School's. Plaintiffs mention in their brief that, at Sanford, A.C.'s "counselor and teachers regularly met and collaborated to develop and improve behavioral strategies," and A.C. and her

12

counselor met "twice per month to work individually on coping strategies." Pls.' Br. 22. The record confirms this. Courtney Gregor, the middle school counselor and learning services specialist at Sanford, met with A.C. "once or twice per month" for her "socioemotional needs." R. 592. However, as explained, Brandywine offered A.C. individual counseling services twice per week, and Brandywine's consultative counseling provided for interaction between psychologist, teachers, and parents.

*RTI*. Plaintiffs argue the IEP failed to indicate that A.C. would continue to receive RTI. Therefore, the argument goes, A.C.'s parents were "unaware" that RTI services would be "available to A.C. for sixth grade." Pls.' Br. 16. However, the record reflects that RTI at Brandywine is a general education initiative, like social studies or art. R. 496. It is not meant exclusively for special education students. *Id.* When a Brandywine student requires Tier II or III RTI, *see supra note* 2, that accommodation would be listed on the student's individual schedule, not her IEP. *Id.* Indeed, any argument that an IEP must list the child's regular class schedule would run contrary to the IDEA, which requires an IEP to describe only the "special education and related services…that will be provided." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Accordingly, Brandywine's failure to include RTI in the IEP does not render it deficient.

*The Learning Support Class*. Finally, Plaintiffs take issue with the Panel's treatment of the "learning support class" – particularly its reliance on "inadmissible" testimony. Pls.' Br. 17. Plaintiffs concede that the IEP lists a "learning support class." Pls.' Reply Br. 7. But Plaintiffs maintain they did not know the precise contours of this

13

class until the Due Process Hearing.[15]  Pls.' Reply Br. 7.

It is true, as Plaintiffs argue, that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993).  "[A] court should…use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time they were made." *Bayonne Bd. of Educ.*, 602 F.3d at 564–65.  The Second Circuit has addressed the scope of this rule, and both parties cite to that Circuit for guidance.  In *R.E. v. N.Y.C. Dep't of*

---

[15] During the Due Process Hearing, A.C.'s mother testified about what appears to be a conversation between herself and school administrators during the August 2019 IEP meeting:

> Q: During this meeting, was there discussion about that educational support classroom?
> A: The learning support classroom?
> Q: Correct.
> A: Yes, that she would go there for 90 minutes twice a week.
> Q: Okay. And what was your understanding on what would be worked on during that learning support class?
> A: Her IEP goals.
> Q: Do you know how big the classroom sizes were that [A.C.] was going to be entering?
> A: They said average was like 10, 12.
> Q: Was that the learning support class, or was that her general education classes?
> A: Her learning support class.

R. 545.  This testimony would appear to indicate that A.C.'s mother was aware of the contours of the learning support class before A.C.'s transfer to the Sanford School.  In any event, as explained *infra*, Plaintiffs' claim that the Panel erred with regard to hearing testimony on the learning support class is without merit.

14

*Educ.*, 694 F.3d 167 (2d Cir. 2012), the Second Circuit explained:

> While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP. For example, if an IEP states that a specific teaching method will be used to instruct a student, the school district may introduce testimony at the subsequent hearing to describe that teaching method and explain why it was appropriate for the student. The district, however, may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used.

*Id.* at 186–87.

Other district courts in our Circuit have cited *Fuhrmann*, *Bayonne Bd. of Educ.*, and *N.Y.C. Dep't of Educ.* to guide retrospective testimony analysis. *See e.g., T.E. v. Cumberland Valley Sch. Dist.*, 2014 WL 47340 (M.D. Pa. 2014); *see also Jalen Z. v. Sch. Dist. of Phila.*, 104 F. Supp. 3d 660 (E.D. Pa. 2015). In *Jalen Z.*, the district court found admissible subsequent testimony that explained a support class' "specific structure and day-to-day routines." *Id.* at 677. Similarly, Brandywine here offered testimony to explain its learning support class. Specifically, the testimony explained that nearly every special education student in Brandywine attends a learning support class for 90 minutes every other day. R. 443. In the class, a small group of students works to further their special education goals under the supervision of a teacher. *Id.* This testimony does not *alter* the IEP; it *explains* it. Brandywine developed the revised IEP over two months, and it had multiple meetings with A.C.'s parents concerning the substance of the IEP. R. 618.

In short, Plaintiffs have not pointed to evidence in the record that undermines the

15

Panel's decision, and they have failed to demonstrate that the IEP was not "reasonably calculated to enable…progress appropriate in light of [A.C.'s] circumstances." *See Endrew F.*, 137 S. Ct. at 1001.

### b. Whether Brandywine Violated Section 504 of the Rehabilitation Act

Section 504 "promise[s] non-discriminatory access to public institutions." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 171 (2017). In the context of special education, Section 504 carries a FAPE requirement. *See* 34 C.F.R. § 104.33(a). Under Section 504, a school district "must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Ridley Sch. Dist.*, 680 F.3d at 280. Here, Plaintiffs base their Section 504 claim on a theory identical to their IDEA claim: namely, that Brandywine failed to provide A.C. a FAPE. For the reasons discussed above, Plaintiffs' Section 504 claim must fail.[16]

### c. Whether Brandywine Violated the Americans with Disability Act

Plaintiffs fare no better under the ADA. To prevail on their ADA claim, A.C. and her parents must prove that A.C.: (1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was

---

[16] Citing no controlling authority, Plaintiffs argue that this Court must use a *de novo* standard of review for their Section 504 and ADA claims; the *modified de novo* standard, they argue, applies only to the IDEA. Pls.' Br. 10. They further note the following: Because the Panel did not consider the Section 504 and ADA claims, this Court cannot defer to any factual findings made by the Panel when considering those claims. Pls.' Br. 17 n.5. To be clear, this Court reaches its conclusions regarding Section 504 and the ADA under either standard of review.

16

otherwise subject to discrimination because of her disability. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). Again, Plaintiffs rely on their claim that Brandywine failed to provide A.C. a FAPE. For reasons previously explained, Plaintiffs' ADA claim must fail.

## IV.     CONCLUSION

For the reasons discussed, Brandywine's motion for judgment on the administrative record is granted, Plaintiffs' cross-motion is denied, and Judgment is entered in favor of Brandywine.